## Case No. 4,319.

### EIGHT HUNDRED BALES OF COTTON.

[8 Blatchf. 221.] [1]

Circuit Court, S. D. New York. Feb. 11, 1871.[2]

William M. Evarts and Clifford A. Hand, for claimants.

Edward H. Owen, for libellants.

WOODRUFF, Circuit Judge. The schooner George W. Hynson, bound on her voyage from New Orleans to Providence, with 800 bales of cotton and 288 barrels of molasses on board, was run on the beach at Squam, on the coast of New Jersey, in the night of the 21st, or morning of the 22d, of January, 1867. The vessel could not afterwards be got off, but went to pieces. Portions of her tackle were saved and the materials of the vessel were sold, the value of the wreck and other things pertaining to the vessel saved being $2,191.21. The libellants are the owners of the vessel, and prosecuted this cause to recover from the cargo a contribution to their loss on the vessel and freight, by way of general average, and a decree was made in their favor in the district court, from which the claimants have appealed to this court.

In the opinion of the district court—Fitzpatrick v. Eight Hundred Bales of Cotton [Case No. 4,843]—the facts are detailed with much minuteness; and it seems to me unnecessary to recite them. To the proper understanding of the principal question argued in this court, it will suffice to say, that, in a storm of wind, rain and snow or sleet, of extraordinary severity, from the eastward, the vessel, after reaching a point about fifteen miles southwardly of Fire island, under pressure of the storm and the loss of

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2] [Affirming Case No. 4,843.]

her mizzen sail and the bonnet of her jib, was headed off towards the south, and afterwards was put before the wind, on a course to the westward, towards the New Jersey shore, in the hope that the storm might abate, or the wind shift, or that she might be able to pass Barnegat and avoid the pressing danger of foundering, she being wholly unable, in the judgment of her master, mate and crew to bear up against the wind. She was put before the wind, with sail reduced, so far as possible, to diminish her speed, and so continued until after midnight. Instead of abating, the storm had increased, and the waves ran high, breaking, at times, over the vessel, the gale being more violent than the master and mate, who had long experience, had ever known on this coast. At about one o'clock, when off and opposite the New Jersey shore, their peril and the conduct which was determined upon, appears in the testimony of the master and mate to a consultation between them, heard by the crew and dissented from by no one, as follows: Thus, the master says: "As the wind was increasing, and no immediate prospect of a shift, I called the mate to me and consulted him about what was to be done to keep the vessel off the beach. I asked him whether he thought it would be a possible thing for the vessel to come up by the wind. He said, that, in his opinion, if the vessel was attempted to be handled in that way, she would surely knock on her beam, and he thought that the best thing that could be done, for the safety of the vessel and cargo, would be to run her high up on the Jersey beach. My opinion before this, and I had come to the conclusion before consulting the mate, was, that, if the vessel was attempted to be brought to the wind, she must roll over, with the sea we had. It was decided to let the vessel go before the wind, unless something different should take place before striking, and let her go head up on the beach as high as possible. * * * I believe that if the attempt had been made to bring the vessel up to the wind, the crew would most likely all have perished. * * * Her course might have been changed a point or two, but an attempt to bring the vessel up to the wind would have resulted in her rolling over immediately." Again, the mate says: "He thought an attempt to get the vessel by the wind would result in her being thrown on her beam's end immediately. I don't undertake to state the precise language, but I spoke something like this—I said, it's hard lines to run a man's vessel on top of the beach, knowing she was going there. He said he thought it was best for all concerned, that the vessel be run on the beach as high as possible, and even proposed trying to get some more mainsail, to drive her further, so that she could go as high up as she would, saying, that an attempt to do otherwise would almost surely result in loss of life.

* * * In my opinion, it would have been both imprudent and useless to have hoisted the sails. It could have been no benefit to us, unless, after hoisting the sails, we had hauled up by the wind. In that case, in my opinion, she would have gone over." The mate says: "Finding that the wind did not die out, but increased, with a higher and sharper sea, and we supposing we were nearing the beach, and there being no prospect of a shift, the captain again asked me, if, in my judgment, there was anything could be done, and if I thought it was a possible thing to get the vessel by the wind. I replied, that I did not, and, that, in my judgment, if the vessel was attempted to be brought to the wind, it would terminate in making an immediate wreck of the vessel and loss of life. He said it was hard to run a man's vessel on the beach, knowing that you were doing so. I told him I knew that, but, of the two evils, it was best to choose the least, and it would be my advice to run her as high on the beach as possible, unless there was a change. He replied, that he didn't see anything else he could do. The vessel was, accordingly, kept directly before the wind and sea. All preparations were made for going on the beach, if we didn't have a shift. We didn't have a shift. The vessel was run high up on Squam beach. * * * I expressed the opinion that it would be impossible to do anything else except go before the wind. * * * I told him, that, if there was no change, it was my opinion that we would have to run the vessel ashore." Other testimony from the master, the mate, and the crew shows that the peril was most imminent, and that the opinions thus expressed were the actual judgment of all, and that the facts thus detailed were true. The case presented was, therefore, this: The vessel and cargo were in imminent peril. In the judgment of her master, mate and crew, they could not be delivered from that peril, and their total loss could not be avoided, by any means in their power except by continuing her course before the wind, as she was then running, and so driving her upon the beach. Any attempt to do otherwise would, in their judgment, produce an immediate foundering of the vessel and the loss of the lives on board. This states the case strongly in favor of the claim made herein by the counsel for the claimants, a little more strongly, perhaps, than is conceded by the libellants, but is the just inference from all the testimony; and I think the evidence warrants the conclusion of fact, that, if the vessel had not been run on shore when and where she was, she would have foundered, with a total loss of vessel, cargo and crew, or have been driven on shore elsewhere, the result of which is entirely uncertain. Hereupon, it is insisted in behalf of the claimants, that there was no voluntary stranding of the vessel; that all that was done was to

submit to an inevitable disaster; that there was no election to do anything; that good seamanship required the master to do as he did, and he did nothing more than good seamanship required; that there was not, in fact, any sacrifice to be made, but the simple inquiry was as to the best mode of meeting the inevitable peril; that the idea of sacrificing the vessel was not in their minds, but only the question, by what skill and judgment, as seamen, the consequences of the peril could be made least disastrous to all who were interested; that a voluntary stranding presupposes some dominion of the master over his vessel, in which he may choose, whether to encounter the risk in which he is involved, and struggle on, accepting the chances of deliverance, or, on the other hand, to make a present sacrifice of the vessel, for the benefit of the other property, or, at least, to subject it to some new peril which he has it in his power to avoid; that her loss was certain, as the vessel must founder, or go on shore where she did, or go on shore at some other and uncertain place on the coast; that, therefore, the stranding here lacks the essential element without which the claim to contribution cannot exist, namely, an actual choice to cast the peril upon a portion of the property involved in the peril, in order that the residue may be saved; that here nothing was in fact done; and that the course of the wind and sea was submitted to, because the chance of saving life and property was greater than could be found in any effort they could make, or in short, because any effort they could make involved the destruction of all.

Doubtless, there is a distinction somewhere between the wreck of a vessel and cargo, in spite of any and every effort of her officers and crew, in the progress of which, at some moment, they give up all effort in despair, and the stranding of a vessel as a choice of evils, one of which is apparently inevitable; and, if the present is a case of voluntary stranding, within the just meaning of the law on that subject, it is not very clear where that line is to be drawn. When stranding is in fact inevitable, its effect on the rights of those interested cannot depend upon the state of mind of the master, or whether he comes to the conclusion sooner or later that it is inevitable and that he will do nothing to prevent it because he cannot do anything with any hope of success. Here, however, although the master and mate acted in the belief that what was done was best for all who were interested, they had an alternative, unpromising to be sure, and, in their judgment, fatal to the interests of all concerned, and, in view of that, they chose a peril to which, in that place and manner, they were not compelled to submit; and they did so in the belief that the interests of all concerned in life and property demanded it. While it seems to me that the case is on the extreme limit to which the definition of a voluntary stranding, within the rule giving contribution in general average, should be carried, I am constrained to say that the decisions of the supreme court of the United States require me to hold that it is within that definition, and to regard the struggle of the claimants here as an effort to open the discussion of those cases.

In Columbian Ins. Co. v. Ashby, 13 Pet. [38 U. S.] 331, the special verdict upon which the case was heard found, in terms, that, in the situation in which the vessel was before she was run on shore, the captain, "finding no possible means of saving the vessel or cargo and preserving the crew, slipped his cables, and ran her on shore, for the safety of the crew and preservation of the vessel and cargo." The vessel was a total loss, and the owners were held entitled to contribution from the owners of cargo saved, in general average. The case, as stated in the special verdict, cannot easily be distinguished from the one now before the court. But, although this fact, that, but for the running on shore, there was, in the judgment of the captain, no possible means of saving vessel or cargo, was in the verdict and was dwelt upon in the argument, it did not influence the decision adversely to the owners. The point chiefly considered by the court was, whether there could be contribution in general average for a voluntary stranding, when the vessel itself was lost, and the court, with all the facts in the special verdict before them, held such contribution proper.

The point now raised was the chief subject of discussion, and was very distinctly decided, in Barnard v. Adams, 10 How. [51 U. S.] 270, in which the marginal note states very accurately the decision, thus: "It was a proper case for contribution, in general average, for the loss of a vessel, where there was an imminent peril of being driven on a rocky and dangerous part of the coast, when the vessel would have been inevitably wrecked with loss of ship, cargo and crew, and this immediate peril was avoided by voluntarily stranding the vessel on a less rocky and dangerous part of the coast, whereby the cargo and crew were saved uninjured." The arguments earnestly pressed in that case were not unlike those employed here, but they were overruled.

The Star of Hope, 9 Wall. [76 U. S.] 203, is in general affirmance of the same doctrine, although other points were involved.

Whatever I might think of the rule, that there could not be, in any sense whatever, a voluntary stranding bearing any similitude to jettison or voluntary exposure to new or different perils from those then impending, where the present condition of the vessel was absolutely hopeless and no chance of saving the vessel existed, by stranding or otherwise, I am wholly unable to withdraw the present case from the influence of the cases above cited. There has been much conflict of opinion upon the questions involved, and my pow-

er of discrimination is not acute enough to enable me to say that what is settled in those cases does not cover the present case.

On the question, whether the vessel was seaworthy when she left New Orleans, I concur with the district court in the opinion that the preponderance of the evidence is, that she was in suitable condition for the voyage.

It is insisted that the vessel was estimated at too high a valuation, and that, in making an allowance for her value, in the general average, a deduction of one fifth should have been made for presumptive deterioration. The true rule on this subject is, to take the value of the ship as she was when the stranding was determined upon, assuming, ·of course, for the· purpose of the estimate, that she was then safe. In her condition of peril, it might be said she had no real value, but her then peril is not to be taken into view. This rule would make all just allowance for deterioration on the voyage, however caused, and is the whole extent of the actual or theoretical sacrifice or loss by the owners for the common benefit; and, where the proof of value relates to some prior period, as at her port of departure on that or any prior voyage, it would be proper to make just allowance for deterioration. Unfortunately for the point made on this appeal, the only proof laid before the commissioner was the estimate of the master, that she was worth "about twenty thousand dollars," and that "she would have sold for that, easy enough." The time to which this refers is not expressly stated. Its connection would seem to indicate that he was speaking of the time when he decided to run her on the beach, though it is not explicit. If neither party saw fit to offer further or other evidence, and the claimants thought proper to leave that estimate to the commissioner, without cross-examination or explanation, I think the commissioner cannot be said to have erred in adopting that sum as the value to be assumed for the purpose of contribution.

The decree must be for tne libellants, in accordance with the decree of the district court, with costs of the appeal.